MEMORANDUM OF DECISION
On April 1, 1999, the Department of Children and Families ("DCF"), filed a petition to terminate the parental rights of A.M., respondent-mother, and J.C., Jr., respondent-father, to their daughter, Priscilla M. (the "petition"). On February 7, 2000, trial concerning the petition occurred in this court. For the reasons stated below, the court grants the petition.
Facts
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Priscilla M. was born on February 19, 1995. On December 12, 1996, the Superior Court for Juvenile Matters issued an Order of Temporary Custody ("OTC"), placing Priscilla in the care of DCF. Prior to the issuance of the OTC, her mother had left her unsupervised. On July 10, 1997, the court adjudicated her as a neglected child, entered Expectations of the court (Exh. 2) and committed her to DCF for up to twelve months. Her commitment was subsequently extended.
On September 21, 1999, this matter was scheduled for trial. Although incarcerated, A. M. was present for a conference at court on that date and was represented by counsel, who advised her of the trial dates, February 7-11, 2000. In addition, on September 28, 1999, the court sent to her a written notice of the CT Page 2162 trial dates. She was released from incarceration in October, 1999. At trial, on February 7, 2000, A. M. did not appear. Her counsel had sought diligently to locate her prior to the trial date, including communicating with her mother, who indicated that A. M. had not been in contact with her either. In view of her failure to appear at trial, the court entered a default as to her.
Previously, on July 28, 1999, the court had accepted J. C., Jr.'s written consent to the termination of his parental rights, dated May 21, 1999. Accordingly, this decision will not address the petition's allegations as to him. Also, A. M. filed a motion for transfer of Priscilla's custody and guardianship to the foster mother, dated June 24, 1999.
B. The Mother
A. M. was born in 1965 in Kingston, Jamaica. She was educated primarily in Jamaica, but attended eighth and ninth grade in the United States. She completed high school and received the equivalent of an associate's degree. When interviewed, she could not recall her employment history.
She has been diagnosed with a terminal illness. She also reported that she was diagnosed as a manic depressive. She has an admitted history of substance abuse, including heroin, crack cocaine, and marijuana. She used marijuana to cope with her life threatening illness.
A. M.'s criminal history includes recent convictions for assault (October, 1999); failure to appear (March, 1999); and threatening (December, 1998). Exh. 10. She also has two felony convictions for risk of injury to a child. Id.
C. The Child
Priscilla was born premature and addicted to crack cocaine, and was afflicted with a cleft palate, which has been corrected by surgery. In May, 1996, about six months prior to the issuance of the OTC in December, 1996, the Yale University School Medicine, Pediatric Specialty Clinic reported that she had poor weight gain, a questionable speech delay, and had had no medical followup in over eleven months. Her medical history showed a period of late immunization. A Birth to Three evaluation in October, 1996 made similar findings, including a mild CT Page 2163 developmental delay. She also has been diagnosed with sleep apnea, due to an upper airway obstruction. Yale University School of Medicine Sleep Study Report, Exh. 4.
She has thrived in foster care. For over three years, since January, 1997, she has been cared for by the same foster family. She is current with immunizations. She has attended the Manchester Early Learning Center where her teacher reported that she was doing "fine". She will attend kindergarten in the fall.
She is an active, petite, intelligent child. Recently she has shown substantial progress in her articulation of words and sentences. According to Ms. Baksay, the current social worker assigned to this case, Priscilla has an exceptional vocabulary.
She is bonded to her foster mother and father, who she calls her "mommy" and "daddy." She also has a strong connection to their older daughter. The foster mother is in the process of adopting her two nephews. Priscilla views the foster family as her family. She is in a loving, supportive setting. The foster family would like to adopt Priscilla.
D. Efforts At Reunification And Rehabilitation
In May, 1997, prior to the neglect adjudication, A. M. had a substance abuse evaluation at Guenster Rehabilitation Center, Inc. ("Guenster"). Exh. 7. With regard to marijuana use, A. M. stated it was part of her religion and culture. Id. at 2. As to cocaine and heroin, she claimed past addiction. Id.
The evaluator recommended individual psychotherapy to help A. M. "with her issues regarding parenting, her life threatening illness, and her history of drug addiction." Id. at 6. Likewise, after a psychological evaluation in May, 1997, Dr. Ruth Grant recommended participation in a medical and therapeutic program.
Similarly, in June, 1997, the Visitation/Reunification Center, which, after a DCF referral in February, 1997, had supervised visits for the previous three months between A. M. and Priscilla. made the recommendations (1) that A. M. engage in individual counseling and (2) that she work on parenting skills in a parenting support setting. It was also recommended that DCF explore other potential in-home support services for A. M. and Priscilla. Exh. 5 (letter dated June 3, 1997, at 2). CT Page 2164
At the time of the neglect adjudication, July 10, 1997, the court entered Expectations. Exh. 2. This order contained a "Notice To Parents," which stated, in pertinent part. "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker." Included in the Expectations were: (1) keep all appointments set by or with DCF; keep whereabouts known to DCF or your attorney; (2) visit the child as often as possible; (3) participate in counseling, including individual and drug/alcohol assessment, and follow recommendations as requested; (4) secure/maintain adequate housing and income; (5) no substance abuse; (6) no involvement with the criminal justice system; (7) DCF to contact physicians to schedule out-patient surgery (presumably for Priscilla) and to inform A. M.'s attorney.[2]
DCF offered a variety of relevant services to A. M. Visitation was facilitated. Transportation to Yale New Haven Hospital and to visitation was provided. Other services included Project Courage (Bridgeport), Child Guidance (Bridgeport), Reunification Services (Norwalk), Neon Shelter (Norwalk), Guenster (for drug screening), Whip Program (for terminally ill women, with health and support services), Yale Primary Care Center, Nathan Smith Clinic at Yale New Haven Hospital, and Birth to Three. She was also provided with casework services and assistance on immigration issues.
In early 1999, prior to the filing of the petition, A. M. stated that she was not involved with any agencies known to DCF. She acknowledged receipt of release information sent by DCF, but did not return it.
Significantly, A. M. did not engage in individual counseling. Apparently, she has never addressed the significant mental health issues which were identified by various professionals in 1997, prior to the neglect adjudication. Exh. 6, a letter from Yale-New Haven Hospital, dated April 22, 1998, stated that, after being seen once at the Nathan Smith Clinic, A. M. did not return for further recommended psychiatric evaluation.
Perhaps most telling is the history of A. M.'s visits to Priscilla. Although she was offered weekly visitation, for the period October 1998 to June 1999, she visited only six times. Another visit was held at a correctional facility in September, 1999. There were seventeen visits that she did not attend, either CT Page 2165 because she stated she was not well or was not available to be transported.
She did bring cakes twice for Priscilla's birthdays. She did not send cards. Since Priscilla has been at her current foster family, which permitted phone calls to her to be made, A. M. has called only three times, the last around Memorial Day in 1999. Priscilla was capable of communicating by phone during a significant part of this time. Priscilla enjoyed the visits with A. M., who she calls "Angela."
When Priscilla had her cleft palate surgery and then her medical consultation for sleep apnea. A. M. was invited to attend and offered transportation by DCF. She did not attend the surgery. On the day of the consultation A. M. became verbally abusive and threatening, necessitating hospital personnel to call for security assistance. A. M. threatened a DCF social worker durinu the consultation. A. M. had to be escorted by security staff to another area. Subsequently, there was no response to a letter to A. M. requesting an office visit following the consultation. She then failed to attend an Administrative Case Review in November, 1998.
A. M. also did not secure adequate housing. She has not kept in contact with DCF. As her record of convictions reflects, she has continued to be involved with the criminal justice system.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and reunify the child with the parent, unless the court finds in this proceeding that the parent is unable and unwilling to benefit from reunification efforts. . . ." Conn. Gen. Stat. § 17a-112(c)(1). "Reasonable" in this context means doing "everything reasonable, not everything possible." In re Antonio M., 56 Conn. App. 534, 546 (2000) (internal quotation and citations omitted). Whether reasonable efforts were made depends on the circumstances of each case. Id. at 547.
In February, 1997, DCF referred A. M. to the Visitation/Reunification Center in South Norwalk. That program CT Page 2166 recommended individual counseling for A. M., as did Guenster and Dr. Grant. The Expectations required it. She never availed herself of such counseling, despite DCF's referrals.
Visitation was of critical import to the possibility of reunification. While A. M. was afforded the opportunity for weekly visitation, and transportation to same, her attendance dropped off markedly. She rarely contacted the foster family to communicate with Priscilla. She did not attend when Priscilla had surgery, although, again, she was afforded the opportunity to do so.
DCF made a variety of timely and relevant referrals to assist A. M., as discussed above, but she did not avail herself of them. Had she done so, the prospects of reunification would have been enhanced.
By clear and convincing evidence, DCF made reasonable efforts to reunify A. M. and Priscilla. Without A. M.'s consistent participation in the services offered and in visitation, there was no reasonable likelihood that reunification could be effectuated. Under these circumstances, reasonable efforts towards reunification clearly were made. The evidence is clear and convincing that A. M. was unable or unwilling to benefit from reunification efforts.[3]
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear convincing evidence that one of several statutory grounds for termination exists. See In reMichael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112(c)(3).
DCF has alleged the grounds of abandonment, failure to rehabilitate (after a neglect adjudication), and failure to rehabilitate as to a child under age seven where parental rights as to another child of the parent were previously terminated pursuant to a DCF petition. The court finds that DCF has proven the first two grounds by clear and convincing evidence. As to the third ground, since no proof was offered to establish that termination occurred pursuant to a DCF petition, the evidence is insufficient. Again, as to J.C., Jr., in view of his consent, no findings need be made as to the petition's allegations concerning him. CT Page 2167
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." In re Roshawn R.,51 Conn. App. 44, 52 (1998) (citations and internal quotation marks omitted).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In reAngellica W., 49 Conn. App. 541, 551 (1998). In that case, among the factors cited in the trial court's abandonment finding were that the child was contacted only sporadically, and "long periods elapsed when the respondent made no significant attempt to see the child." Id. at 552. Similarly, In re Drew R.,47 Conn. App. 124, 129 (1997) the lower court's adjudication of abandonment was affirmed where "the respondent's contact with his son was random at best. . . ." The respondent also "did not CT Page 2168 often telephone or write inquiring about his son. . . ." Id. at 130. The Appellate Court concluded, "The minimum interest set forth by the respondent does not come close to overcoming the proof of abandonment. . . ." Id.
Here the record shows, clearly and convincingly, that A. M. abandoned Priscilla. While she visited regularly in the early part of 1997, after the OTC, this contrasts sharply with her six visits between October, 1998 and June, 1999. Even if all six of these visits occurred prior to the filing of the petition on April 1, 1999, which is the adjudicatory date for this ground, that would still amount to a paucity of occasions in a six month period when transportation was available for weekly visits.
Her almost total lack of phone contact is significant also, as was her absence when her very young daughter was undergoing surgery. She did not sent cards to Priscilla.
While A. M. may have loved Priscilla, it is evident that she did not demonstrate the requisite continuing concern for her. Her occasional contact with Priscilla was sufficient to have Priscilla remember her name but not enough to meet the statutory standard. She did not fulfill even minimally the "general obligations of parenthood."
2. Failure To Rehabilitate/Prior Neglect Adjudication
This statutory ground for termination arises when "the parent of a child who . . . has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). The court previously has found Priscilla to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In re Hector L., CT Page 216953 Conn. App. 359, 366-67 (1999). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only a parent's conduct before the filing of the termination petition, but also the conduct occurring after it. Here, about nine months elapsed between the filing of the termination petition in April, 1999 and the trial in early February, 2000, which is a reasonable time, especially given the age of the child.
As the Appellate Court recently stated In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether A. M. was better able to be a parent to Priscilla when the petition was filed than at the time of her commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed in April, 1999, approximately one year and nine months after Priscilla's neglect adjudication in July, 1997.
The evidence is clear and convincing that A. M. is not able to be a parent to Priscilla and that she could not become able to do so within a reasonable time.
Prior to the court-ordered Expectations and afterwards, DCF made timely and appropriate referrals for A. M. to deal with various issues. Important components of rehabilitation in this case were counseling and visitation. As outlined above, A. M.'s need for counseling was identified early in these proceedings. She did not avail herself of counseling. Just as important, she visited Priscilla only occasionally. She did not take advantage of the regular access to her child which she was afforded.
She continued to be involved with the criminal justice system, as reflected by recent convictions. She has not maintained stable housing. She has not presented a viable plan for Priscilla's care. Since she was released from incarceration in October, 1999, she has lost contact with Priscilla and with DCF. Without excuse, A. M. also did not appear at trial, although she had adequate advance notice of the commencement date.
In the interim, all of Priscilla's needs, including for love and support, as well as attention to her sleep apnea, have had to be met by others. She has become bonded to and sees herself as CT Page 2170 part of her foster family, where she has thrived.
The evidence is clear and convincing that A. M. has not gained the ability to care for Priscilla, nor could she within a reasonable time. There is no reason to believe that she is better able to be a parent to Priscilla than she was at the time of the neglect adjudication and commitment in July, 1997. There is no reason to believe that A. M. will be able to assume a responsible position in Priscilla's life within the foreseeable future.
3. Failure To Rehabilitate/Prior Termination
DCF also alleges that A. M.'s parental rights should be terminated on the ground of failure to rehabilitate concerning a child under age seven where "such parent's parental rights have been terminated pursuant to a petition filed by the Commissioner of Children and Families." Conn. Gen. Stat. § 17a-112(c)(3)(E). In pertinent part, the Summary of Adjudicatory Facts For Termination Of Parental Rights, dated April 1, 1999, which is part of the petition, alleges, at 3, par. 6, and at 11, par. 19, that A. M.'s parental rights previously were terminated as to two other children. The court heard testimony concerning two terminations at trial. However, neither the testimony nor the exhibits established that her rights as to either of these children were terminated pursuant to a petition filed by DCF's Commissioner. Without this necessary element this ground has not been proved. In re Daniel D., 1999 Conn. Sup. 64, 76 (January 27, 1999) (Dyer, J.). Accordingly, this ground is dismissed.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF had proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2); In re Juvenile Appeal (83-CD),189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for Priscilla. In re Antony B., 54 Conn. App. 463, 476 (1999); In reAlexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R.,47 Conn. App. 124, 131 (1997). CT Page 2171
The evidence is clear and convincing that termination is in Priscilla's best interest. Her mother is no longer a meaningful part of her life. Priscilla is living in a safe, nurturing environment with her loving foster parents who, to her, are her "mommy" and "daddy." The foster family has stated its willingness to adopt her.
She is entitled to permanency and stability as she grows up. If termination were denied Priscilla would remain in prolonged foster care for no reason. Without question, termination of A. M.'s rights is in Priscilla's best interest.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(d). See In re Tabitha P., 39 Conn. App. 353,362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Priscilla and of appropriate and timely services for visitation, counseling, and other support services. These services were relevant to A. M.'s needs.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation, relevant services and referrals, and made reasonable efforts to reunite the family. There was no reasonable possibility of reunification as a result of A. M.'s failure to utilize services and the gaps in her willingness and ability even to visit or express concern for Priscilla.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The reasonable court-ordered Expectations were discussed above, at 4-6. DCF provided appropriate referrals and opportunities for visitation. A. M. did not come close to fully adhering to those CT Page 2172 Expectations. She did not keep appointments set by and with DCF. She did not visit Priscilla for lengthy periods of time. She did not engage in counseling except for a single intake which recommended further evaluation. She did not maintain adequate housing. She did not avoid involvement in the criminal justice system.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Priscilla is bonded to her foster parents. She loves them and considers herself part of their family. She has lived with them for over three years, which is most of her life. At this juncture, while she enjoyed seeing her mother in the past, it is not clear that she has any significant feelings for her.
5) The age of the child.
Priscilla is about to turn age five. She is in the stable and nurturing setting provided by her foster family. Leaving her in the "limbo" of foster care would not be in her best interest. Over three years in foster care is more than sufficient.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds A. M. has not made reasonable efforts to adjust her circumstances or conditions to make it in Priscilla's best interests to return to her in the foreseeable future. She has not maintained contact with Priscilla or with the foster family. As stated above, she ignored the referrals which would have helped her adjust her circumstances and conditions. CT Page 2173
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, A. M. did not face unreasonable interference from anyone or from economic circumstances. Her predicament is a consequence of her own actions and her failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Priscilla M. for termination of parental rights to enter with respect to the mother, A. M., and the father, J. C., Jr. Accordingly, the court hereby grants the petition to terminate the parental rights of A. M. and J. C., Jr. The motion for transfer of custody and guardianship, dated June 24, 1999, is denied.
The court further orders that the Commissioner of DCF is appointed statutory parent to Priscilla. The foster parents have stated their willingness to adopt. It is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT